UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE PEOPLE OF THE STATE OF NEW YORK,
by ERIC T. SCHNEIDERMAN, Attorney General
of the State of New York,

         Plaintiff,

 - against -

EVANS BANCORP, INC. and
EVANS BANK, N.A.,

         Defendants.

Civil Action No. _____

**COMPLAINT AND
JURY DEMAND**

---

The People of the State of New York, by and through its attorney, ERIC T. SCHNEIDERMAN, Attorney General of the State of New York ("Attorney General"), respectfully allege:

## PRELIMINARY STATEMENT

1. The Attorney General brings this action against Evans Bancorp, Inc. ("Bancorp") and Evans Bank, N.A. (the "Bank," and together with Bancorp, "Evans") for unlawful discrimination on the basis of race in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.*, and Chapter 154 of the Code of the City of Buffalo, § 154-1 *et seq.*  From at least 2009 to the present, Evans has engaged in intentional discrimination in violation of these laws by "redlining," or denying a neighborhood access to credit on account of its racial composition.

2. Evans has systematically denied its residential mortgage lending products and services to African-Americans in the Buffalo metro area.  From at least 2009 to the present, Evans has redlined the predominantly African-American neighborhoods in the Buffalo metro

area by: (a) intentionally excluding predominantly African-American neighborhoods from its lending area; (b) developing mortgage lending products that it made unavailable to those predominantly African-American neighborhoods, notwithstanding the creditworthiness of the applicants; and (c) refusing to solicit customers, market loan products, and provide banking facilities in those predominantly African-American neighborhoods.   Evans's intentional discrimination against African-Americans continues to this day.

3.      The Buffalo metro area has historically had high levels of residential segregation. According to U.S. Census data, the Buffalo metro area was among the most highly segregated large metropolitan areas in the nation in each of 1980, 1990, 2000, and 2010.

4.      According to U.S. Census data from the relevant period, all of the suburbs surrounding Buffalo are majority non-Hispanic white ("White").  Indeed, many of the suburban neighborhoods in the Buffalo metro area are 90% White or greater.   The racial minority populations in the Buffalo metro area are largely concentrated in the City of Buffalo, which is home to over 70% of the African-American population in the metro area.

5.      The City of Buffalo itself is racially segregated.  The dividing line is Main Street. East of Main Street are all of the majority African-American neighborhoods in Buffalo (the "Eastside neighborhoods").  The African-American population in these neighborhoods is highly concentrated, with several Eastside neighborhoods having a population that was 90% African-American or greater during the relevant period, according to U.S. Census data.  West of Main Street there are no majority African-American neighborhoods, and most of the neighborhoods have a majority-White population.

6.      Evans has adopted a policy of redlining by limiting the geographic area in which the Bank markets and sells its mortgage loan products to exclude the Eastside neighborhoods.

Evans calls this defined geographic area its "Trade Area."  Although Evans has defined its Trade Area to include much of the City of Buffalo and the surrounding metro area, Evans has drawn a line bisecting the city and excluding from its Trade Area all of the majority African-American neighborhoods in Buffalo.

7.      By eliminating the Eastside neighborhoods from its Trade Area, Evans has on the basis of race disqualified all borrowers with Eastside properties from eligibility for certain of the Bank's mortgage products and has excluded all Eastside residents from product marketing and customer solicitation efforts.

8.      Evans created a map describing its Trade Area and placed that map in a file that Evans made available to the public pursuant to the Community Reinvestment Act, 12 U.S.C. § 2901 *et seq.*  A copy of the portion of the Trade Area map in and around Buffalo, as obtained from Evans's public file, is below at Figure 1.  *See infra* ¶ 10.

9.      A copy of the same portion of Evans's Trade Area map, modified to illustrate Evans's redlining of predominantly African-American neighborhoods in the Buffalo metro area is below at Figure 2.  *See infra* ¶ 11.

10.

## FIGURE 1



Source: Evans Bank

11.



12.     In addition to using its Trade Area to redline the Eastside neighborhoods, Evans has adopted policies and practices that amplify the discriminatory effects of its redlining.

13.     These policies and practices include: an explicit policy restricting eligibility for certain mortgage products to only certain geographic areas outside of the Eastside neighborhoods; a practice of locating Evans's branch offices and ATMs bearing the Evans Bank trade name ("branded ATMs") to avoid African-American communities in the Buffalo metro area; and a practice of marketing Evans's loan products and services in a manner that excludes African-Americans and residents of the Eastside neighborhoods.

14.     Evans's redlining, as exacerbated by these policies and practices, is intended to deny and discourage an equal opportunity to obtain credit to African-Americans and Eastside residents.  In addition, Evans's redlining has the effect of denying and discouraging an equal opportunity to obtain credit to African-Americans and Eastside residents.

15.     Evans's redlining has caused a disparate impact on African-Americans and residents of the Eastside neighborhoods.

16.     Analysis of Evans's lending activity from 2009 to 2012 reveals statistically significant disparities demonstrating that Evans failed to draw mortgage applications from and originate mortgage loans to both African-American borrowers in the Buffalo metro area and Eastside borrowers of any race at the rates expected based on the lending activity of comparable banks operating in the same area during the same period.

17.     Evans's redlining has also harmed New York State.  As then-Chairman of the Federal Reserve Ben Bernanke observed in a 2012 speech, "redlining" and other forms of lending discrimination "continue to have particular significance to mortgage markets" in the wake of the financial crisis, where "overly tight lending standards may now be preventing

creditworthy borrowers from buying homes, thereby slowing the revival in housing and impeding the economic recovery."

18.     Evans's redlining has perpetuated segregated housing patterns, subjected New Yorkers to unlawful discrimination on the basis of race, and impaired the ability of African-American borrowers and residents of the Eastside neighborhoods to gain access to credit despite record-low interest rates.  Evans's redlining has had damaging effects over time in the Eastside neighborhoods, including contributing to increased vacancies due to the unavailability of new purchase loans and increased deterioration of housing stock due to the unavailability of home improvement loans.

19.     Accordingly, the Attorney General brings this action pursuant to its *parens patriae* authority to protect the People of the State of New York from unlawful discrimination, and seeks injunctive relief, damages, civil penalties, and costs against Evans.

## JURISDICTION AND VENUE

20.     The Attorney General brings this action pursuant to its *parens patriae* powers to protect the rights of the People of the State of New York under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.*, and Chapter 154 of the Buffalo City Code, § 154-1 *et seq.*

21.     This Court has jurisdiction over Plaintiff's claims under the Fair Housing Act pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 3613(a)(1)(A).

22.     This Court has jurisdiction over Plaintiff's claims under the New York State Human Rights Law and Buffalo City Code pursuant to 28 U.S.C. § 1367, N.Y. Exec. L. § 297(9), and Buffalo City Code § 154-20(C).

23.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

24.     The Attorney General has *parens patriae* authority to bring this action to protect the State's substantial quasi-sovereign interest in the economic health and well-being of its residents, and, in particular, to protect the right of residents of Buffalo's Eastside neighborhoods and African-American homebuyers and prospective homebuyers in the Buffalo metro area to be free from unlawful redlining and discrimination.

25.     Absent action by the Attorney General, such persons could not independently obtain complete relief.  A redlining action by an individual would not comprehensively remedy the harm caused to New York State's substantial quasi-sovereign interests by Evans's redlining, including the pervasive harm to residents of the Eastside neighborhoods and the larger African-American community in the Buffalo metro area.

## PARTIES

26.     Plaintiff, the People of the State of New York, is represented by its chief legal officer, Eric T. Schneiderman, Attorney General of the State of New York.

27.     Defendant Evans Bank, N.A. is a federally chartered bank founded in 1920 and headquartered in Hamburg, New York.

28.     Defendant Evans Bancorp, Inc. is a financial holding company headquartered in Hamburg, New York.  The Bank is a wholly owned subsidiary of Bancorp.

## FACTUAL ALLEGATIONS

29.     Evans offers the traditional services of a financial depository and lending institution, including the receipt of monetary deposits and the financing of residential mortgage and commercial loans.   As of June 30, 2014, the Bank's total assets were more than

$830 million.  From at least 2009 to 2012, the majority of the loan applications received by Evans and loans originated by Evans have been in the Buffalo metro area.

30.     In operating and expanding its business over time, Evans has avoided and excluded the African-American communities in the Buffalo metro area using a pattern and practice of discriminatory redlining, while serving the credit needs of other communities throughout the metro area.  Evans has engaged in this pattern and practice of redlining, including implementing each of the discriminatory policies and practices described herein, on an ongoing and continuous basis from at least 2009 to the present.

31.     Evans's policies and practices concerning the delineation of the Bank's Trade Area, the location of branch offices and branded ATMs, and the marketing of the Bank's products and services intentionally discriminate against African-Americans.  These policies and practices also cause the discriminatory effects of perpetuating housing segregation and denying and discouraging on account of race an equal opportunity to obtain credit to Eastside residents and African-American homebuyers and homeowners.

**Evans Has Intentionally Redlined The Eastside
Neighborhoods By Excluding Them From Its Trade Area**

32.     Evans has intentionally refused to solicit business from the majority African-American neighborhoods in the City of Buffalo.  By redlining the Eastside neighborhoods using its Trade Area, Evans has excluded the vast majority of Buffalo's African-American population from the Bank's efforts to market and sell its loan products and services.

33.     Evans has set forth rules governing the Bank's lending practices in its Commercial and Consumer Lending Policy ("Lending Policy").  The Lending Policy describes the Bank's Trade Area, which is the geographic area in which Evans solicits business and markets its lending products and services.   The Lending Policy requires that Evans's

"[m]anagement must ensure that the needs of the bank's trade area are being met by marketing the full range of loan products and services through advertising, involvement in local community and civic groups and officer calls."

34.     Evans's Lending Policy also sets the boundaries of the Trade Area.  A map of the portion of Evans's Trade Area in and around the City of Buffalo is set forth above at Figure 2. *See supra* ¶ 11.

35.     Evans's Trade Area includes nearly all of the majority-White suburban areas surrounding the City of Buffalo.  Inside Buffalo, however, the Trade Area follows Main Street, bisecting the city and excluding the majority African-American Eastside neighborhoods, while including the areas west of Main Street, which are not majority African-American.  As a result, Evans's Trade Area reinforces and perpetuates the historical divide between African-Americans and the rest of the City of Buffalo.

36.     Evans's Lending Policy does not require the Bank to market its loan products and services or otherwise solicit customers anywhere outside of its Trade Area.  Rather, the Lending Policy indicates that "from time to time a loan request may be received" from outside of the Trade Area, and it states that such applications must be evaluated on "an individual case by case basis" while considering multiple factors, including a policy of limiting the "concentration of loans outside of our trade area."

37.     Having decided not to solicit business outside its Trade Area, Evans also categorically excludes properties outside the Trade Area from key parts of its mortgage business.

38.     Evans *automatically* disqualifies borrowers with properties outside of its Trade Area from eligibility for certain mortgage products and services, regardless of the creditworthiness of such borrowers.

39.     Evans made multiple mortgage loan products available during the relevant period only to borrowers with properties located in certain defined geographic areas.  These defined geographic areas were largely restricted to neighborhoods within Evans's Trade Area, and excluded entirely the Eastside neighborhoods.  Accordingly, Eastside residents seeking to refinance a mortgage and borrowers seeking to finance the purchase of a new Eastside home are automatically ineligible for these products.

40.     For example, Evans Community Solutions is a community lending product that offers underwriting flexibilities regardless of household income.  However, according to Evans's own description, Evans designed this product to be available only to borrowers "whose properties are located within an Evans Bank defined geographic area," which Evans has defined to be limited to specific Census tracts, none of which is in the Eastside neighborhoods.  Borrowers with a property in the Eastside neighborhoods were thus automatically and categorically ineligible, even if they were creditworthy and otherwise qualified for the Evans Community Solutions loan product.

41.     As a result of these policies and practices, Evans receives the vast majority of its loan applications from and originates the vast majority of its loans to borrowers inside of its Trade Area, including over 80% of its home mortgage loan originations.

42.     By redlining the Eastside neighborhoods and carving them out of the Bank's Trade Area, Evans has excluded an area that is home to over 75% of Buffalo's African-American population from the marketing and sales of its mortgage products and services.

43.     In stark contrast, Evans has drawn its Trade Area to include most of the neighborhoods in Buffalo that are not majority African-American, including neighborhoods with socioeconomic indicators that are comparable to those of Eastside neighborhoods.

44.   In addition, Evans has included in its Trade Area most of the suburbs surrounding the City of Buffalo.  These suburbs all have majority-White populations.  However, Evans has excluded from its Trade Area the suburban areas with substantial African-American populations.

45.   According to U.S. Census data, the only Census tracts in the Buffalo metro area outside the City of Buffalo that are over 40% African-American are located in the western part of the Town of Cheektowaga, which is the suburb immediately east of Buffalo's Eastside neighborhoods.  Like Buffalo, Cheektowaga is racially segregated, with the African-American neighborhoods all concentrated in the western part of the town.

46.   Evans's Trade Area follows Interstate 90 through Cheektowaga, bisecting the town and excluding all predominantly African-American neighborhoods, but including the portion of Cheektowaga east of the highway, which is majority-White.

47.   By redlining this portion of Cheektowaga, Evans has excluded from its Trade Area an area that is home to over 65% of Cheektowaga's African-American population.

48.   Evans's redlining of the Eastside neighborhoods and other African-American communities in the Buffalo metro area intentionally discriminates against African-Americans.  In addition, Evans's redlining has the discriminatory effect of denying and discouraging, on the basis of race, an equal opportunity to obtain credit to African-Americans and Eastside residents.

**Evans's Branching Practices Exclude**
**Predominantly African-American Neighborhoods**

49.   Evans has amplified the discriminatory effects of its redlining by adopting a practice of locating its branch offices and branded ATMs outside of African-American communities, including the Eastside neighborhoods.

50.     Evans operates fourteen full-service branches in the State of New York, thirteen of which serve the Buffalo metro area.  Of these thirteen branches, two are located in the City of Buffalo, and eleven are located in suburban and rural towns in Erie County.

51.     Evans has been operating in the Buffalo metro area since 1920, when it established its first office in the Erie County town of Angola, approximately 20 miles south of Buffalo.  Evans has expanded considerably since that time, establishing multiple branch offices in the suburbs surrounding Buffalo beginning in the 1990s, and establishing branch offices in the City of Buffalo in 2005 and 2008.

52.     Evans's branch offices are important not only for serving existing customers, especially in connection with complex transactions such as residential mortgage loans, but also for attracting new customers.  Evans's goals for branch office expansion include not only providing enhanced convenience for current customers, but also enhancing brand awareness among non-customers and entering new markets.

53.     However, as it has expanded throughout the Buffalo metro area, Evans has consistently and exclusively located its branch offices in majority-White Census tracts, and has avoided locating any branch offices in majority African-American Census tracts, such as the Eastside neighborhoods.  Evans has also located its branded ATMs exclusively in majority-White Census tracts.  Indeed, Evans's network of branches and branded ATMs forms a ring around the Eastside neighborhoods, and Evans does not have a branch office or branded ATM in any of the majority African-American Census tracts in the Buffalo metro area.

54.     A map of Evans's branch offices and branded ATMs in Buffalo and the surrounding suburbs is below at Figure 3.  *See infra* ¶ 55.

55.



FIGURE 3

Sources: FDIC, Evansbank.com

56.     Through its branching practices, Evans has been able to avoid serving African-American communities while comprehensively serving other communities in Buffalo and throughout the Buffalo metro area.  According to the 2010 U.S. Census, over 38% of Buffalo's population is African-American; however, less than 5% of the population is African-American in the areas where Evans's two Buffalo branch offices are located.

57.     Evans's branching practices reinforce the Bank's redlining of the Eastside neighborhoods and intentionally discriminate against African-Americans.  In addition, Evans's branching practices have the discriminatory effect of denying and discouraging, on the basis of race, an equal opportunity to obtain credit to African-Americans and Eastside residents.

**Evans's Marketing Practices**
**Exclude African-American Communities**

58.     Pursuant to Evans's Lending Policy, the Bank's efforts to "market[ ] the full range of loan products and services" are limited to its Trade Area.  Because Evans has used its Trade Area to redline the Eastside neighborhoods, these marketing efforts largely exclude Eastside residents and African-Americans in the Buffalo metro area.

59.     For example, Evans placed the vast majority of its print media advertising in local newspapers with a limited geographic circulation, such as the Amherst Bee, the Cheektowaga Bee, and the North Buffalo Rocket.  None of these local newspapers is distributed to the Eastside neighborhoods.

60.     Similarly, Evans placed advertising in ethnic media sources, such as the Am-Pol Eagle, a publication directed towards the Polish community, which is largely White.  However, documents produced by Evans indicate that the Bank did not place any advertising in ethnic newspapers or other media outlets directed towards the African-American community.

61.    Other marketing campaigns by Evans are centered around the Bank's branch offices.  For example, Evans has conducted direct mail advertising campaigns that were restricted to addresses within a certain distance from existing branch offices.  Because Evans has located its branches exclusively in majority-White areas, these campaigns did not reach the Eastside neighborhoods and largely excluded African-Americans in the Buffalo metro area.

62.    Evans's marketing practices reinforce the Bank's redlining of the Eastside neighborhoods and intentionally discriminate against African-Americans.  In addition, Evans's branching practices have the discriminatory effect of denying and discouraging, on the basis of race, an equal opportunity to obtain credit to African-Americans and Eastside residents.

**Evans's Lending Activity In The Buffalo Metro Area**
**Demonstrates The Discriminatory Effects Of Its Redlining**

63.    Because Evans has refused to solicit customers, market and sell mortgage products, and establish banking facilities in the Eastside neighborhoods, Evans draws mortgage applications from and makes mortgage loans to African-American borrowers and Eastside borrowers at far lower rates than other banks doing business in the Buffalo metro area.

64.    Evans's far lower rates of drawing mortgage applications and making mortgage loans to African-American and Eastside borrowers are apparent from data that Evans was required to maintain and report pursuant to the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. § 2803; *see* U.S. Dep't of Hous. & Urban Dev., Final Rule, Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. at 11460, 11478 (Feb. 15, 2013) ("[A]nalysis of loan level data identified through HMDA may indicate a disparate impact.").

65.    Congress enacted HMDA because it found that some banks had "contributed to the decline of certain geographic areas by their failure pursuant to their chartering

responsibilities to provide adequate home financing to qualified applicants on reasonable terms and conditions."  12 U.S.C. § 2801(a).

66.    HMDA requires covered financial institutions, such as Evans, to report data concerning all applications received for home purchase loans, home improvement loans, and refinancing loans.  Data that must be reported pursuant to HMDA includes the race reported by the applicant, the Census tract in which the property securing the loan is located, and whether the loan was originated.  The most recent HMDA data currently available is from the year 2012.

67.    According to HMDA data from 2009 to 2012, Evans received 1,114 residential mortgage applications in the Buffalo-Niagara Metropolitan Statistical Area ("Buffalo-Niagara MSA" or "MSA").  Of these 1,114 applications, *only four* applications (0.36%) came from applicants reporting as African-American, and *only eight* applications (0.72%) came from applicants of any race with a property in the Eastside neighborhoods.  Of the mortgage applications from the Eastside neighborhoods, *only one* (0.009%) was from an applicant reporting as African-American.

68.    The HMDA data shows that Evans lags far behind other banks both in (a) generating mortgage applications from African-American borrowers and Eastside borrowers and (b) making mortgage loans to African-American borrowers and Eastside borrowers.

69.    For example, when compared with all other banks that, like Evans, had at least one branch office in the City of Buffalo and were doing business in the MSA from 2009 to 2012 ("Buffalo-area banks"), Evans drew mortgage applications from African-American borrowers and Eastside borrowers at *by far the lowest rate*.

70.     Indeed, from 2009 to 2012, the overall rates at which Buffalo-area banks generated mortgage applications from African-American applicants in the MSA and applicants with a property in the Eastside neighborhoods were *several* times higher than Evans's rates.

71.     The disparities between Evans's lending activity and the lending activity of other Buffalo-area banks are statistically significant.  Statistical analysis indicates disparities of a magnitude greater than two standard deviations between (a) the very low numbers of applications Evans actually generated from African-American borrowers and Eastside borrowers and (b) the significantly higher numbers of applications that Evans should have generated from such borrowers based on the lending activity of comparable banks.

72.     Evans lags behind not only Buffalo-area banks, but also many banks that do not even have an office in the City of Buffalo.  Many such banks, even though they lacked Evans's presence in Buffalo, drew mortgage applications from African-American borrowers and Eastside borrowers at more than *double* the rates that Evans did from 2009 to 2012.

73.     As noted above, Evans's performance lagged not only with respect to drawing applications from African-American borrowers and Eastside borrowers, but also with respect to originating mortgages to such borrowers.  In short, Evans originated mortgage loans to such borrowers at rates far lower than comparable banks.

74.     Statistical analysis of HMDA data indicates disparities of a magnitude greater than two standard deviations between (a) the very low numbers of loans Evans actually made to African-American borrowers and Eastside borrowers and (b) the significantly higher numbers of loans Evans should have made to such borrowers based on the lending activity of comparable banks.

75.     These statistically significant disparities did not result from random chance.  They arose from Evans's discriminatory policies and practices.  In other words, the disparate impact on African-Americans and Eastside residents actually resulted and will continue to result from Evans's redlining of the Eastside neighborhoods; disqualification of Eastside properties from eligibility for certain loan products, regardless of creditworthiness; location of bank branches and branded ATMs to avoid the Eastside neighborhoods; and refusal to market its products and services to the Eastside neighborhoods and other African-American communities.

76.     Evans's redlining and discriminatory policies and practices are not necessary to achieve any of its substantial legitimate, nondiscriminatory interests.

## FIRST CAUSE OF ACTION
### Fair Housing Act, 42 U.S.C. § 3605(a)

77.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     Evans's redlining of the Eastside neighborhoods as described herein constitutes unlawful discrimination in making available residential real estate-related transactions on the basis of race, in violation of Section 805 of the Fair Housing Act, 42 U.S.C. § 3605(a).

79.     Evans's redlining constitutes unlawful discrimination against African-Americans on the basis of race, and unlawful discrimination against residents of the Eastside neighborhoods on the basis of the racial composition of those neighborhoods.

80.     The Attorney General acting in his capacity as *parens patriae* is an "aggrieved person" under the Fair Housing Act, 42 U.S.C. § 3602(a)(1)(A).

81.     Evans is an entity whose business includes engaging in "residential real estate-related transactions," as defined by the Fair Housing Act, 42 U.S.C. § 3605(b).

82.     Evans has discriminated in making available residential real estate-related transactions by redlining the Eastside neighborhoods, disqualifying properties in the Eastside neighborhoods from eligibility for certain of its loan products regardless of borrower creditworthiness, refusing to solicit mortgage business from the Eastside neighborhoods, locating its branches so as to avoid the Eastside neighborhoods and other areas with substantial African-American populations, and refusing to market its products and services in the Eastside neighborhoods and to African-Americans in the Buffalo-Niagara MSA.

83.     Evans has redlined the Eastside neighborhoods in continuing violation of the Fair Housing Act by maintaining and enforcing its discriminatory policies and practices, as described herein, continuously from at least 2009 to the present.

84.     Evans's redlining is motivated by a discriminatory intent and results in disparate treatment of African-Americans in the Buffalo-Niagara MSA on the basis of race.

85.     Evans's redlining also caused and predictably will continue to cause discriminatory effects, including a disparate impact on African-Americans and the perpetuation of segregated housing patterns because of race.

**SECOND CAUSE OF ACTION**
**Fair Housing Act, 42 U.S.C. § 3604(a)**

86.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.     Evans's redlining of the Eastside neighborhoods as described herein constitutes unlawfully making dwellings unavailable, in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a).

88.     Evans's redlining constitutes unlawful discrimination against African-Americans on the basis of race, and unlawful discrimination against residents of the Eastside neighborhoods on the basis of the racial composition of those neighborhoods.

89.     The Attorney General acting in his capacity as *parens patriae* is an "aggrieved person" under the Fair Housing Act, 42 U.S.C. § 3613(a)(1)(A).

90.     Evans has made dwellings unavailable by redlining the Eastside neighborhoods, disqualifying properties in the Eastside neighborhoods from eligibility for certain of its loan products regardless of borrower creditworthiness, refusing to solicit mortgage business from the Eastside neighborhoods, locating its branches so as to avoid the Eastside neighborhoods and other areas with substantial African-American populations, and refusing to market its products and services in the Eastside neighborhoods and to African-Americans in the Buffalo-Niagara MSA.

91.     Evans has redlined the Eastside neighborhoods in continuing violation of the Fair Housing Act by maintaining and enforcing its discriminatory policies and practices, as described herein, continuously from at least 2009 to the present.

92.     Evans's redlining is motivated by a discriminatory intent and results in disparate treatment of African-Americans in the Buffalo-Niagara MSA on the basis of race.

93.     Evans's redlining also caused and predictably will continue to cause discriminatory effects, including a disparate impact on African-Americans and the perpetuation of segregated housing patterns because of race.

### THIRD CAUSE OF ACTION
### Fair Housing Act, 42 U.S.C. § 3604(b)

94.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.     Evans's redlining of the Eastside neighborhoods as described herein constitutes unlawful discrimination in the provision of services or facilities in connection with the sale of dwellings, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b).

96.     Evans's redlining constitutes unlawful discrimination against African-Americans on the basis of race, and unlawful discrimination against residents of the Eastside neighborhoods on the basis of the racial composition of those neighborhoods.

97.     The Attorney General acting in his capacity as *parens patriae* is an "aggrieved person" under the Fair Housing Act, 42 U.S.C. § 3613(a)(1)(A).

98.     Evans has discriminated in the provision of services or facilities in connection with the sale of dwellings by redlining the Eastside neighborhoods, disqualifying properties in the Eastside neighborhoods from eligibility for certain of its loan products regardless of borrower creditworthiness, refusing to solicit mortgage business from the Eastside neighborhoods, locating its branches so as to avoid the Eastside neighborhoods and other areas with substantial African-American populations, and refusing to market its products and services in the Eastside neighborhoods and to African-Americans in the Buffalo-Niagara MSA.

99.     Evans has redlined the Eastside neighborhoods in continuing violation of the Fair Housing Act by maintaining and enforcing its discriminatory policies and practices, as described herein, continuously from at least 2009 to the present.

100.    Evans's redlining is motivated by a discriminatory intent and results in disparate treatment of African-Americans in the Buffalo-Niagara MSA on the basis of race.

101.    Evans's redlining also caused and predictably will continue to cause discriminatory effects, including a disparate impact on African-Americans and the perpetuation of segregated housing patterns because of race.

## FOURTH CAUSE OF ACTION
### Fair Housing Act, 42 U.S.C. § 3604(c)

102.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

103.    Evans's redlining of the Eastside neighborhoods as described herein constitutes unlawfully making or publishing statements or advertisements with respect to the sale of dwellings that indicate an intention to discriminate based on race, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c).  Discriminatory statements and advertisements include selecting media or locations for advertising that deny particular segments of the housing market information about housing opportunities because of race.  28 C.F.R. § 100.75.

104.    Evans's redlining constitutes unlawful discrimination against African-Americans on the basis of race, and unlawful discrimination against residents of the Eastside neighborhoods on the basis of the racial composition of those neighborhoods.

105.    The Attorney General acting in his capacity as *parens patriae* is an "aggrieved person" under the Fair Housing Act, 42 U.S.C. § 3613(a)(1)(A).

106.    Evans has unlawfully made or published discriminatory statements or advertisements by redlining the Eastside neighborhoods, disqualifying properties in the Eastside neighborhoods from eligibility for certain of its loan products regardless of borrower creditworthiness, refusing to solicit mortgage business from the Eastside neighborhoods, locating its branches so as to avoid the Eastside neighborhoods and other areas with substantial African-American populations, and refusing to market its products and services in the Eastside neighborhoods and to African-Americans in the Buffalo-Niagara MSA.

107.   Evans has redlined the Eastside neighborhoods in continuing violation of the Fair Housing Act by maintaining and enforcing its discriminatory policies and practices, as described herein, continuously from at least 2009 to the present.

108.   Evans's redlining is motivated by a discriminatory intent and results in disparate treatment of African-Americans in the Buffalo-Niagara MSA on the basis of race.

109.   Evans's redlining also caused and predictably will continue to cause discriminatory effects, including a disparate impact on African-Americans and the perpetuation of segregated housing patterns because of race.

### FIFTH CAUSE OF ACTION
### New York State Human Rights Law, N.Y. Exec. Law § 296-a(1)(b)

110.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

111.   Evans's redlining of the Eastside neighborhoods as described herein constitutes unlawful discrimination on the basis of race by a creditor in the withholding of credit and the fixing of the terms or conditions of credit, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296-a(1)(b).

112.   Evans's redlining constitutes unlawful discrimination against African-Americans on the basis of race, and unlawful discrimination against residents of the Eastside neighborhoods on the basis of the racial composition of those neighborhoods.

113.   The Attorney General acting in his capacity as *parens patriae* is a "person claiming to be aggrieved by an unlawful discriminatory practice," as defined by the New York State Human Rights Law, N.Y. Exec. L. § 297(9).

114.     Evans is a "creditor," namely, a "person or financial institution which does business in this state and which extends credit," as defined by the New York State Human Rights Law, N.Y. Exec. Law § 292(22).

115.     Evans has discriminated in the withholding of credit and the fixing of terms or conditions of credit by redlining the Eastside neighborhoods, disqualifying properties in the Eastside neighborhoods from eligibility for certain of its loan products regardless of borrower creditworthiness, refusing to solicit mortgage business from the Eastside neighborhoods, locating its branches so as to avoid the Eastside neighborhoods and other areas with substantial African-American populations, and refusing to market its products and services in the Eastside neighborhoods and to African-Americans in the Buffalo-Niagara MSA.

116.     Evans has redlined the Eastside neighborhoods in continuing violation of the New York State Human Rights Law by maintaining and enforcing its discriminatory policies and practices, as described herein, continuously from at least 2009 to the present.

117.     Evans's redlining is motivated by a discriminatory intent and results in disparate treatment of African-Americans in the Buffalo-Niagara MSA on the basis of race.

118.     Evans's redlining also caused and predictably will continue to cause discriminatory effects, including a disparate impact on African-Americans and the perpetuation of segregated housing patterns because of race.

### SIXTH CAUSE OF ACTION
### New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a)

119.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120.     Evans's redlining of the Eastside neighborhoods as described herein constitutes an unlawful discriminatory refusal, withholding, or denial of the accommodations, advantages,

facilities, and privileges of a public accommodation, including the extension of credit, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a).

121.    Evans's redlining constitutes unlawful discrimination against African-Americans on the basis of race, and unlawful discrimination against residents of the Eastside neighborhoods on the basis of the racial composition of those neighborhoods.

122.    The Attorney General acting in his capacity as *parens patriae* is a "person claiming to be aggrieved by an unlawful discriminatory practice," as defined by the New York State Human Rights Law, N.Y. Exec. L. § 297(9).

123.    The Bank is a "place of public accommodation," namely, a "wholesale [or] retail store[ or] establishment[ ] dealing with goods or services of any kind," as defined by the New York State Human Rights Law, N.Y. Exec. Law § 292(9), and Evans is the "owner" of a place of public accommodation, § 296(2)(a).

124.    Evans has refused, withheld, and denied the accommodations, advantages, facilities, and privileges of the Bank by redlining the Eastside neighborhoods, disqualifying properties in the Eastside neighborhoods from eligibility for certain of its loan products regardless of borrower creditworthiness, refusing to solicit mortgage business from the Eastside neighborhoods, locating its branches so as to avoid the Eastside neighborhoods and other areas with substantial African-American populations, and refusing to market its products and services in the Eastside neighborhoods and to African-Americans in the Buffalo-Niagara MSA.

### SEVENTH CAUSE OF ACTION
### Buffalo City Code § 154-17(G)

125.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.    Evans's redlining of the Eastside neighborhoods as described herein constitutes unlawful discrimination in the issuance and terms and conditions of mortgage loans, in violation of Buffalo City Code § 154-17(G).

127.    Evans's redlining constitutes unlawful discrimination against African-Americans on the basis of race, and unlawful discrimination against residents of the Eastside neighborhoods on the basis of the racial composition of those neighborhoods.

128.    The Attorney General acting in his capacity as *parens patriae* is an "aggrieved party," as defined by Buffalo City Code § 154-20(C).

129.    Evans is a "bank . . . whose business consists in whole or part of the making of loans and arranging of financing for housing or secured by real property," as required by Buffalo City Code § 154-17(G).

130.    Evans has discriminated in the issuance and terms of conditions of credit by redlining the Eastside neighborhoods, disqualifying properties in the Eastside neighborhoods from eligibility for certain of its loan products regardless of borrower creditworthiness, refusing to solicit mortgage business from the Eastside neighborhoods, locating its branches so as to avoid the Eastside neighborhoods and other areas with substantial African-American populations, and refusing to market its products and services in the Eastside neighborhoods and to African-Americans in the Buffalo-Niagara MSA.

131.    Evans has redlined the Eastside neighborhoods in continuing violation of the Buffalo City Code by maintaining and enforcing its discriminatory policies and practices, as described herein, continuously from at least 2009 to the present.

132.    Evans's redlining is motivated by a discriminatory intent and results in disparate treatment of African-Americans in the Buffalo-Niagara MSA on the basis of race.

133.    Evans's redlining also caused and predictably will continue to cause discriminatory effects, including a disparate impact on African-Americans and the perpetuation of segregated housing patterns because of race.

## EIGHTH CAUSE OF ACTION
### Buffalo City Code § 154-5 to -6

134.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135.    Evans's redlining of the Eastside neighborhoods as described herein constitutes an unlawful discriminatory refusal, withholding, or denial of the accommodations, advantages, facilities, and privileges of a public accommodation, in violation of Buffalo City Code § 154-5 to -6.

136.    Evans's redlining constitutes unlawful discrimination against African-Americans on the basis of race, and unlawful discrimination against residents of the Eastside neighborhoods on the basis of the racial composition of those neighborhoods.

137.    The Attorney General acting in his capacity as *parens patriae* is an "aggrieved party," as defined by Buffalo City Code § 154-20(C).

138.    The Bank is a "place of accommodation, not in its nature distinctly private," and Evans "owns" such a place of accommodation, as required by Buffalo City Code § 154-5 to -6.

139.    Evans has refused, withheld, and denied the accommodations, advantages, facilities, and privileges of the Bank by redlining the Eastside neighborhoods, disqualifying properties in the Eastside neighborhoods from eligibility for certain of its loan products regardless of borrower creditworthiness, refusing to solicit mortgage business from the Eastside neighborhoods, locating its branches so as to avoid the Eastside neighborhoods and other areas

with substantial African-American populations, and refusing to market its products and services in the Eastside neighborhoods and to African-Americans in the Buffalo-Niagara MSA.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff prays that the Court enter an order that:

A.      Declares that the policies and practices of Evans constitute a violation of the Fair Housing Act, the New York State Human Rights Law, and the Buffalo City Code;

B.      Enjoins Evans, its agents, employees, and successors, and all other persons in active concert or participation with Evans, from

        1.      Discriminating on account of race in any aspect of its lending business practices;

        2.      Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Evans's unlawful conduct to the position they would have been in but for the discriminatory conduct; and

        3.      Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any such discriminatory conduct in the future; to eliminate, to the extent practicable, the effects of Evans's unlawful practices; and to implement policies and procedures to ensure that all segments of Evans's market areas are served without regard to protected characteristics;

C.      Awards monetary damages to compensate for the harm done to the quasi-sovereign interests of New York State by Evans's discriminatory policies and practices, pursuant to 42 U.S.C. § 3613, N.Y. Exec. L. § 297(9), and Buffalo City Code § 154(20)(C);

D.      Assesses a civil fine or penalty against Evans in an amount authorized by N.Y. Exec. L. § 297(4)(c) and (9), in order to vindicate the injury to the quasi-sovereign interests of New York State caused by Evans's willful, wanton, and malicious conduct;

E.      Awards punitive damages pursuant to 42 U.S.C. § 3613(c)(1) and N.Y. Exec. L. § 297(9);

F.      Awards Plaintiff's reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2) and Buffalo City Code § 154(20)(C); and

G.      Awards such other and further relief as this Court may deem appropriate and as may be required in the interests of justice.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: Buffalo, New York
September 2, 2014

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By:

Mayur Saxena [*][†]
Assistant Attorney General
Mayur.Saxena@ag.ny.gov

Jessica Attie [†]
Special Counsel
Jessica.Attie@ag.ny.gov

Kristen Clarke [†]
Bureau Chief
Kristen.Clarke@ag.ny.gov

Office of the NYS Attorney General
Civil Rights Bureau
120 Broadway
New York, NY 10271
Tel. (212) 416-8250
Fax (212) 416-8074

Michael Russo [*]
Assistant Attorney General In-Charge
Michael.Russo@ag.ny.gov

Office of the NYS Attorney General
Buffalo Regional Office
Main Place Tower, Suite 300A
Buffalo, NY 14202
Tel. (716) 853-8400
Fax (716) 853-8571

[*] Counsel of Record

[†] Pro hac vice application to be filed